**D UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Ima Iliu Flores Zelaya, et al.,<br><br>　　　Plaintiffs<br><br>v.<br><br>Las Vegas Metropolitan Police Department, et al.,<br><br>　　　Defendants | 2:13-cv-01181-JAD-CWH<br><br>**Order denying plaintiff Flores-Zelaya's motion for partial summary judgment, granting in part and denying in part defendants' motion for summary judgment, and denying plaintiffs' request for oral argument**<br><br>[ECF 83, 99, 115] |

Luis Solano, a pretrial detainee in the psychiatric unit of the Clark County Detention Center ("CCDC"), died after he was forcibly restrained by four corrections officers.  Solano's heirs and estate sue the Las Vegas Metropolitan Police Department ("Metro"), which runs the CCDC; former Sheriff Gillespie; and the four correctional officers, claiming that Solano died from positional asphyxiation—a known risk of the type of weight-bearing restraint these officers employed—and they bring a host of federal civil-rights and state-law tort claims.  The officers contend they enjoy qualified immunity from the suit.

Both sides move for summary judgment.  The plaintiffs seek summary judgment only on their excessive-force claim and the officers' qualified-immunity defense, and they ask for a hearing; defendants move for summary judgment in their favor on all claims.  I find these motions suitable for disposition without a hearing.[1]  Because there is a material dispute about what the officers did when they restrained Solano, I deny summary judgment on plaintiffs' excessive-force claim, the qualified-immunity issue, and plaintiffs' claims against Metro and the officers for assault, battery, negligence, and wrongful death.  I find that the plaintiffs have not met their burden to offer evidence to support their other claims, so I grant summary judgment in defendants' favor on all remaining claims.

---

[1] L.R. 78-2.

# The Factual Record

On January 21, 2013, Solano was arrested for trafficking cocaine, booked at the CCDC, and examined by a doctor and psychiatrist in accordance with the center's standard procedures.[2] One month later, Solano filed a request for medical care stating, "I have anxiety. I'm trying to get some pills for that please! Thank u!"[3] A nurse responded with the note: "This facility does not provide medication for anxiety. Try to exercise 45 minutes daily before dinner, and read the attached sheet for help with anxiety."[4]

## A.      The February 25, 2013, events

Two days later, a nurse was called to Solano's cell[5] and found the pretrial detainee, who had allegedly been disobedient and disruptive, sitting in a chair in handcuffs.[6] Solano reported thoughts of harming others.[7] The nurse later testified that Solano was "polite" but had "this bizarre . . . very bewildered look on his face."[8] She evaluated him and transferred him to the detention center's psychiatric unit.[9] Solano was transferred that day.

Approximately three hours after his arrival in the psychiatric unit, Solano and the other inmates were released from their cells into a common area for free time.[10] Correctional officers Temple, Gray, and Dixon watched from a protected area called "the bubble."[11] The officers

---

[2] ECF 99 at 4 (citing ECF 83-1).

[3] *Id.*

[4] ECF 83-4.

[5] ECF 83-6.

[6] ECF 99-8 at 14.

[7] ECF 83-6.

[8] ECF 99-8 at 14.

[9] *Id.*

[10] ECF 99-6 at 8.

[11] *Id.*

immediately noticed that Solano was acting strangely.[12]  Gray testified in his deposition that Solano "was acting erratic and a little bit different";[13]  Temple testified that Solano entered the common area "being loud, disrupting the unit, [and] yelling."[14]  Solano "was ordering [other inmates] to do things that they did not want to do."[15]

Temple became concerned for the safety of other inmates and ordered Solano to "calm down."[16]  When that failed, Temple exited the bubble to speak with Solano.[17]  Temple had hoped that, by exiting the bubble, entering the module, and issuing additional verbal commands, Solano would calm down.[18]  Temple was mistaken.[19]  His actions had no effect; Solano continued to yell and act strangely.[20]  Temple called his supervisor, Sergeant Aspiazu, for assistance.[21]

Aspiazu responded immediately and noticed the Solano had impermissibly crossed a red line separating the common area from the bubble.[22]  Solano was visibly anxious and knocking on the bubble's glass partition; Aspiazu believed that Solano wanted to talk.[23]  Aspiazu testified that this behavior was not abnormal: "it is a psych unit so we kind of take [this] into consideration. . . . I've had inmates come up to the glass on all the modules. . . . I thought maybe he needed me to translate

---

[12] *Id.* at 9.

[13] *Id.*

[14] EFC 99-5 at 12.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* at 13.

[22] ECF 99 at 6 (citing ECF 99-4 at 14).

[23] *Id.*

something.  So it's not uncommon. . . ."[24]  Aspiazu ordered Solano to return to his cell; but Solano refused.[25]  Aspiazu ordered Temple, Dixon, and Gray to follow him into the module.[26]

What happened next is less clear.  Aspiazu testified at his deposition that Solano moved toward the officers in an attempt to exit the common area through the bubble's door and that he was yelling "open the fucking door" and saying something about the water.[27]  But surveillance footage appears to show Solano back away from the officers when they entered the module's common area.[28] And plaintiffs argue that Solano was initially compliant with the officers' commands when they entered the common area.

Either way, the officers apparently perceived a threat and decided to place Solano in handcuffs from a standing position.[29]  A struggle ensued: the four officers surrounded Solano and attempted to restrain him, but Solano resisted, and the group moved around the room.[30]  About 20 seconds later, the officers took Solano—who was yelling "no, fuck no"—to the ground.[31]  The struggle continued for approximately three minutes.[32]  One officer was able to get one of Solano's hands cuffed; but Solano allegedly freed the cuffed wrist and swung the cuff as a weapon.[33]

The four officers eventually subdued and fully restrained Solano.  Aspiazu testified that he was the only officer who placed his body weight on Solano and that the other three officers

---

[24] ECF 99-4 at 14.

[25] *Id.* at 16.

[26] *Id.*

[27] *Id.* at 16–17.

[28] *See* ECF 84-1.

[29] ECF 99-4 at 18.

[30] ECF 84-1.

[31] *Id.*; ECF 99-4 at 18.

[32] *Id.*

[33] ECF 99-4 at 23 (deposition transcript at 77).

1    restrained Solano's arms, sides, and legs.[34]  But handheld camera footage—which begins after

2    Solano was fully retrained—shows a different set of facts:[35] as many as all four officers appear to

3    have their body weight on Solano (mostly on his torso), who is laying prone with his legs folded up

4    behind him, and Solano is non-responsive and appears lifeless.[36]

5            CPR was eventually initiated, and Solano was transported to a nearby hospital.  Although he

6    had a pulse, Solano never regained consciousness.  He died seven days later.[37]  Solano's death

7    certificate lists "positional asphyxia due to, or as a consequence of, police restraint procedures" as

8    Solano's cause of death.[38]

9    **B.      The lawsuit**

10           Plaintiffs Ima Iliu Flores-Zelaya and Elia Delcarmen Solano-Patricio are the Special Co-

11   administrators of Solano's estate, and they bring this action on behalf of Solano's estate and his

12   heirs.[39]  They sue Metro; the CCDC's contracted medical provider Naphcare, Inc.[40]; former Metro

13   Sheriff Gillespie; and Metro correctional officers Aspiazu, Temple, Dixon, and Gray.  They allege

14   four claims under 42 U.S.C. § 1983: excessive force, deliberate indifference to Solano's serious

15   medical needs, violation of Solano's children's substantive due-process right to their father's

16   companionship, and a *Monell* claim.[41]  Plaintiffs also allege state-law claims for assault, battery,

---

17

18   [34] ECF 99-4 at 22 (deposition at 74:20–23; 75:15–19).

19   [35] ECF 84-1.

20   [36] *Id.*

21   [37] *See* ECF 99 at 9 (citations omitted).

22   [38] ECF 83-18.

23   [39] ECF 54.

24

25   [40] Naphcare is not a party to these cross-motions.

26   [41] ECF 54 at 8–13.  Plaintiffs' first two federal claims are lumped under a single heading in the
     complaint.  *See id.* at 8.  Both parties and I treat these as separate causes of action.  I also note that

27   although plaintiffs refer to the officers collectively as the "Official Defendants," the complaint sues
     the officers in their individual capacity because plaintiffs seek damages from them.  *See id.* at ¶ 14;

28   *see also Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999) ("We also have presumed that

1    negligence, negligent training and supervision, and wrongful death.[42]

2    **C.      Cross-motions for summary judgment**

3          The parties now cross-move for summary judgment.[43]  Plaintiff Solano-Patricio seeks

4    summary judgment in her favor on just two issues: (1) Aspiazu, Temple, Dixon, and Gray's liability

5    for her § 1983 excessive-force claim; and (2) these four corrections officers' qualified-immunity

6    defense.[44]  The corrections officers, Sheriff Gillespie, and Metro oppose the motion and move for

7    summary judgment on all claims against them and on the officers' qualified-immunity defense.[45]

8    Both plaintiffs separately oppose the defendants' motion, and Flores-Zelaya also joins in Solano-

9    Patricio's opposition.[46]  I now consider each argument, find that genuine issues of material fact

10   preclude summary judgment in either side's favor on the excessive-force claim, the officers'

11   qualified-immunity defense, and the assault, battery, negligence, and wrongful-death claims against

12   Metro and the officers.  I grant summary judgment in defendants' favor on all other claims.

**Discussion**

14   **A.      Summary-judgment standards**

15          The legal standard governing the parties' motions is well settled: a party is entitled to

16   summary judgment when "the movant shows that there is no genuine issue as to any material fact

17   and the movant is entitled to judgment as a matter of law."[47]  An issue is "genuine" if the evidence

18

19

_____

20
21   officials necessarily are sued in their personal capacities where those officials are named in a
     complaint, even if the complaint does not explicitly mention the capacity in which they are sued.").

22   [42] ECF 54 at 15–19.

23   [43] ECF 83, 99.

24   [44] ECF 83.

25   [45] ECF 99.

26   [46] ECF 106, 108.

27
28   [47] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R.
     CIV. P. 56(c)).

1   would permit a reasonable jury to return a verdict for the nonmoving party.[48]  A fact is "material" if

2   it could affect the outcome of the case.[49]

3        When considering a motion for summary judgment, I view all facts and draw all inferences in

4   the light most favorable to the nonmoving party.[50]  The purpose of summary judgment is "to isolate

5   and dispose of factually unsupported claims"[51] and to determine whether a case "is so one-sided that

6   one party must prevail as a matter of law."[52]  It is not my role to weigh evidence or make credibility

7   determinations.[53]  If reasonable minds could differ on material facts, summary judgment is

8   inappropriate.[54]

9        If the moving party shows that there is no genuine issue as to any material fact, the burden

10  shifts to the nonmoving party, who must "set forth specific facts showing that there is a genuine

11  issue for trial."[55]  The nonmoving party "must do more than simply show that there is some

12  metaphysical doubt as to the material facts"; the nonmoving party "must produce specific evidence,

13  through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary

14  basis on which a reasonable fact finder could find in his favor.[56]  When reviewing the parties' papers,

15

16

17  _____

18  [48] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

19  [49] *Id.* at 248.

20  [50] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

21
22  [51] *Celotex Corp.*, 477 U.S. at 323–24.

23  [52]*Anderson*, 477 U.S. at 252.

24  [53] *Id.* at 249, 255.

25  [54] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

26
27  [55] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 323.

28  [56] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

1   I only consider properly authenticated, admissible evidence.[57]

**B.   Genuine issues of material fact preclude summary judgment on plaintiffs' excessive-force claim and the defendants' qualified-immunity defense.**

Plaintiffs allege that officers Aspiazu, Temple, Dixon, and Gray violated Solano's right to life and security of his person.[58]  Both parties brief this cause of action (so I treat it) as an excessive-force claim.[59]  In response, the officers raise the affirmative defense of qualified immunity,[60] and both sides move for summary judgment on both the excessive-force claim and this defense.  I first consider whether defendants enjoy qualified immunity from the excessive-force claim.

### 1.   *Qualified immunity*

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[61]  Officers "are not entitled to qualified immunity if (1) the facts 'taken in the light most favorable to the party asserting the injury show that the defendants' conduct violated a constitutional right' and (2) the right was clearly established at the time of the alleged violation."[62]  These inquiries may be conducted in either order.[63]  I take them in reverse order and first consider whether plaintiffs have alleged a clearly established constitutional right.

---

[57] FED. R. CIV. P. 56(c); *Orr*, 285 F.3d at 773–74.  Defendants contend that plaintiffs failed to authenticate various exhibits to their motions for summary judgment.  The unauthenticated exhibits are not material to my conclusions.

[58] ECF 54 at ¶ 54(c).

[59] *See generally* ECF 83 at 13; ECF 91 at 22; ECF 99 at 21.

[60] *See* ECF 55 at 5.

[61] *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (Nov. 9, 2015) (quoting *Pearson*, 555 U.S. at 221).

[62] *Sandoval v. Las Vegas Metropolitan Police Dep't.*, 756 F.3d 1154 (9th Cir. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[63] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1        ### a.   *Plaintiffs have alleged a clearly established right.*

2        "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a

3   statutory or constitutional right that was clearly established at the time of the challenged conduct.'"[64]

4   The right may not be characterized "at a high level of generality."[65]  Instead, "[t]he dispositive

5   question is 'whether the violative nature of *particular* conduct is clearly established.'"[66]  "An officer

6   'cannot be said to have violated a clearly established right unless the right's contours were

7   sufficiently definite that any reasonable official in his shoes would have understood that he was

8   violating it,' meaning that 'existing precedent placed the statutory or constitutional question beyond

9   debate.'"[67]

10       Plaintiffs characterize Solano's clearly established right as the right to be free from excessive

11  force.[68]  But the more particular conduct they highlight is the officers' act of using "body pressure to

12  restrain a delirious, prone, and handcuffed individual who posed no serious safety threat."[69]

13       A decade before Solano's death, the Ninth Circuit held in *Drummond v. City of Anaheim*[70]

14  that "squeezing the breath from a compliant, prone, and handcuffed [mentally ill] individual despite

15  his pleas for air involves a degree of force that is greater than reasonable" and "that reasonable

16  officers would have" known that.  Ninth Circuit panels in unpublished excessive-force/qualified-

17  immunity cases—at least one of which involved Metro officers—have held that *Drummond* removed

18  any doubt that the Fourth Amendment is violated when "two officers use their body pressure to

19

20  [64] *City & Cty. of San Francisco, Calif. v. Sheehan*, __ U.S. __, 135 S. Ct. 1765, 1774 (May 18, 2015)
21  (quoting *Plumhoff v. Rickard*, 572 U.S. __, 134 S. Ct. 2012, 2023 (2014)).

22  [65] *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083
23  (2011)).

24  [66] *Id*. (quoting *al-Kidd*, 131 S. Ct. at 2084).

25  [67] *Sheehan*, 135 S. Ct. at 1774 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. at 2084).

26  [68] ECF 83 at 21.

27  [69] *Id*. at 23.

28  [70] *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059–62 (9th Cir. 2003).

1    restrain a delirious, prone, and handcuffed individual who poses no serious safety threat."[71]  Indeed,

2    Metro readily acknowledges that its officers are trained "to avoid placing body weight on the back or

3    torso of a prone handcuffed individual for an extended period of time—i.e., positional asphyxiation

4    training."[72]  Thus, when the defendants restrained Solano in 2013, he had a right to be free from

5    excessive force, which included the clearly established right to be free from the type and amount of

6    restraint that the plaintiffs allege Solano endured.[73]

7
8
    **b.**     ***Genuine issues of fact preclude summary judgment on defendants'***
              ***qualified-immunity defense.***

9    The second prong of the qualified-immunity analysis—whether Aspiazu, Temple, Dixon, and

10   Gray violated this clearly established right—is not so easily resolved because the record contains

11   conflicting accounts of what happened.  Aspiazu testified that he was the only officer with his knee

12   on Solano, and Temple testified that the other psychiatric inmates appeared afraid of Solano.  But a

13   reasonable jury could find that the video evidence shows a materially different account of events.

14   Although the surveillance video has no sound, a reasonable jury viewing it could conclude that it

15   appeared the other inmates were unconcerned with Solano.[74]  And the grainy images of the officers

16   could be perceived as all having their weight on Solano when they first took him down and pinned

17   him on the floor.[75]

18   The recording from the handheld video that begins shortly after the officers had fully

19   restrained Solano is of far better quality, has sound, and depicts the situation from a different angle

20
21   [71] *See Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th Cir. 2012); *Abston v.*
     *City of Merced*, 506 Fed. App'x 650, 653 (9th Cir. 2013) ("It was clearly established that defendants'
22   use of body compression to restrain a prone and bound suspect, who was in no position to offer any
     meaningful resistance, would violate the rule established by *Drummond* nearly five years earlier, in
23   2003.").

24   [72] ECF 99 at 17:8–10; ECF 99-1 at ¶ 12; ECF 99-4 at 65:1–5; ECF 99-5 at 6–8; ECF 99-6 at 7–10;
     ECF 99-7 at 23; ECF 99-13.
25

26   [73] *Drummond*, 343 F.3d at 1059–62.

27   [74] ECF 102-1 (notice of manual filing).

28   [75] *Id*.

than the surveillance camera.  Reasonable jurors viewing that recording could conclude that there were at least three—and possibly four—250-plus-pound officers kneeling with their weight bearing down on Solano's torso.[76]

These genuine disputes over how much force the defendants used and whether it was justified under these circumstances prevents me from concluding as a matter of law that the defendants' actions violated the Constitution.  The Ninth Circuit has made clear that when qualified immunity "depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury," and summary judgment is not available.[77]  This is just such a case.   Accordingly, summary judgment on the qualified-immunity issue must be—and is—denied.

### 2.  *Excessive force*

These same factual disputes prevent me from resolving plaintiffs' excessive-force claim on summary judgment in either party's favor.  Plaintiffs argue that the amount of force used on Solano was unreasonable because this pretrial detainee was emotionally disturbed, initially compliant with the officers' commands, and nonetheless gang tackled by four officers for acting erratically and refusing to return to his cell.[78]  Defendants' narrative differs significantly.  They contend that Solano

---

[76] ECF 83-17 (notice of manual filing of handheld video recording).  A juror could reasonably infer that the knee-shaped skin discoloration on Solano's torso, left after one of the officers was helped up, was made by the officer while he was restraining Solano with his knee.

[77] *Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998); *see also Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1052 (9th Cir. 2014) (holding that disputed facts about what officer knew and believed during detention of arrestee "and how much force was actually used in effectuating the stop" "preclude[d] a determination as to qualified immunity at the summary judgment stage. . . . Instead, this question must go before a jury."); *Conner v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Torres v. City of Los Angeles*, 548 F.3d 1197, 1211 (9th Cir. 2008)) ("Under the current approach . . . [o]nly where 'historical facts material to the qualified immunity determination are in dispute' should the district court submit the issue to a jury."); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."); *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000) (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)) ("The determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if the material facts are undisputed.").

[78] ECF 83 at 18.

1   was frightening other detainees and that the officers responded with low-level force (i.e., officer

2   presence and verbal commands) in compliance with Metro's standard-operating procedure.[79]  When

3   that failed, they proportionately increased their use of force: Aspiazu led Temple, Gray, and Dixon

4   into the common area with the hope that increased officer presence and verbal commands would

5   coax Solano into compliance.  And when that failed, Aspiazu tried to handcuff Solano from a

6   standing position and escort him back to his cell.  That, too, failed, leaving the officers with no

7   alternative but to take Solano "to the ground" while "purposefully avoid[ing] putting unnecessary

8   weight on [him]."[80]  Defendants aver that "[o]nly Sgt. Aspiazu put weight on [Solano's] shoulder to

9   hold him down for handcuffing purposes."[81]

10              a.      *The objective-reasonableness standard*

11          Last year in *Kingsley v. Hendrickson*, the United States Supreme Court clarified the standard

12   for pretrial detainees' excessive-force claims and held that "a pretrial detainee must show only that

13   the force purposely or knowingly used against him was objectively unreasonable."[82]  "Objective

14   reasonableness turns on the 'facts and circumstances of each particular case.'"[83]  It ignores the

15   officers' intentions and "the 20/20 vision of hindsight" and requires the trial court to "account for the

16   'legitimate interests that stem from the government's need to manage the facility in which the

17   individual is detained.'"[84] This analysis "appropriately defer[s] to 'policies and practices that in the

18   judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain

19   institutional security.'"[85]  It also accounts for the fact that "officers are often forced to make split-

---

21   [79] *See* ECF 91 at Ex. 8.

22   [80] ECF 91 at 24.

23   [81] *Id.*

24   [82] *Kinglsey v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *see also Graham v. Connor*, 490 U.S. 386,
25   397 (1989).

26   [83] *Kingsley*, 135 S. Ct. at 2473 (quoting *Graham*, 490 U.S. at 396).

27   [84] *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

28   [85] *Id.*

1  second judgments—in circumstances that are tense, uncertain, rapidly evolving—about the amount

2  of force that is necessary in a particular situation."[86]

3      The objective-reasonableness standard cannot be mechanically applied.[87]  But in *Kingsley*,

4  the High Court offered these considerations for trial courts examining the reasonableness of force

5  used on a pretrial detainee:

6          the relationship between the need for the use of force and the amount
           of force used; the extent of the plaintiff's injury; any effort made by
7          the officer to temper or to limit the amount of force; the severity of the
           security problem at issue; the threat reasonably perceived by the
8          officer; and whether the plaintiff was actively resisting.[88]

9  Of course, "a detainee's mental illness [also] must be reflected in any assessment of the

10  government's interest in the use of force."[89]  And the Ninth Circuit has cautioned that, because this

11  "'balancing nearly always requires a jury to sift through disputed factual contentions[] and to draw

12  inferences therefrom[,] summary judgment or judgment as a matter of law should be granted

13  sparingly' in cases involving claims of excessive force."[90]

14

15      **b.    *Neither party is entitled to summary judgment on plaintiffs' excessive-force
           claim because the record of the corrections officers' actions is too unsettled.***

16      I first consider the extent of Solano's injury.[91]  The injury alleged is death.  Plaintiffs contend

17  it was caused by the officers' use of force; defendants claim an improperly placed breathing

18  tube—placed by hospital staff—was the culprit.  Although the parties dispute the legal and

19  proximate cause of Solano's death, nobody denies that Solano ultimately died, nor do they dispute

20

21  ─────────────────

     [86] *Graham*, 490 U.S. at 396–97; *Kingsley*, 135 S. Ct. at 2474.
22

23   [87] *Kingsley*, 135 S.Ct. at 2473.

24   [88] *Id*. (citing *Graham*, 490 U.S. at 396).

25   [89] *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (citing *Deorle v. Rutherford*,
     272 F.3d 1272, 1282–83 (9th Cir. 2001)).
26

27   [90] *Gregory v. Cty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting *Drummond*, 343 F.3d at
     1056 (internal quotation marks omitted).
28

     [91] *Kingsley*, 135 S.Ct. at 2473.

1   that Solano became unconscious while officers restrained him and he had to be hospitalized.  This

2   consideration weighs in favor of finding that the force used here may have been unreasonable.

3        I next consider "the severity of the security problem at issue" and "the threat reasonably

4   perceived by the officer."[92]  Defendants assert that Solano was acting erratically and shouting

5   expletives, which "can be very problematic" in a psychiatric unit.[93]  Temple testified that he "had a

6   bad feeling" because Solano "came out [into the common area] during free time being loud,

7   disrupting the unit, yelling" and was "demanding things such as water"; other detainees "were like

8   kind of afraid, hesitant, [and] they weren't sure what to do."[94]  And Solano refused to return to his

9   cell when ordered by Temple and Aspiazu.[95]  Relying on *Gregory v. County of Maui* and *Gibson v.*

10  *County of Washoe*, defendants argue that it was reasonable as a matter of law for the officers to

11  perceive a threat because Solano disobeyed a command and refused to return to his cell.[96]

12       Defendants construe the facts and law too narrowly.  A reasonable officer "must" consider a

13  detainee's mental illness when weighing the government's interest in the use of force.[97]  Whether a

14  reasonable officer would regard Solano's behavior as an immediate threat or a harmless display of

15  mental illness is unclear.  Surveillance footage shows other detainees sitting near Solano and

16  walking around him as he engaged in the allegedly threatening conduct.  And Aspiazu testified that

17  Solano's initial conduct was "not uncommon."[98]  This would seem to belie Temple's testimony that

18  Solano frightened others and Aspiazu's testimony that Solano posed a security threat—but it is not

19

20  _____

21  [92] *Id.*

22  [93] ECF 91 at 7.

23  [94] ECF 91-5 at 12–13.

24  [95] *Id.* at 11.

25  [96] ECF 99 at 22.

26  [97] *Drummond*, 343 F.3d at 1058 (citing *Doeorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir.

27  2001)).

28  [98] ECF 99-4 at 14.

my role to weigh evidence on summary judgment.[99]

A second disputed fact precludes me from placing the checkmark for this factor in defendants' column. It is unclear whether a reasonable officer could, as defendants argue, reach the conclusion within five seconds that Solano was an immediate threat.[100] Certainly, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[101] But the evidence does not suggest that these circumstances were "tense, uncertain, and rapidly evolving." In fact, Aspiazu testified that Solano's initial conduct was "not uncommon,"[102] and defendants contend that Solano was engaging in "passive resistence" (i.e., not responding to commands) when they determined that he was an immediate threat.[103]

The three remaining *Kingsley* factors—the relationship between the need for force and the amount of force used, the officers' effort to temper or limit the amount of force, and whether Solano was actively resisting[104]—all turn on disputed facts that cannot be resolved on summary judgment. Plaintiffs argue that the officers' use of force was unreasonable because Solano posed no threat, and they note that Solano complied with the officers' initial command and was visibly suffering from a mental illness.[105] Defendants respond that Solano "passively resisted" the officers' attempted use of

---

[99] *See Anderson*, 477 U.S. at 249, 255.

[100] *See* ECF 99 at 10 (citing ECF 84-1 at 1:43:53–1:43:58).

[101] *Graham*, 490 U.S. at 396–97.

[102] ECF 99-4 at 14.

[103] *See* ECF 91 at 23; ECF 99 at 22.

[104] *Kingsley*, 135 S.Ct. at 2473.

[105] ECF 83 at 14.

1   low-level force.[106]  Temple testified that Solano ignored his repeated commands to be quiet,[107] and

2   Aspiazu testified that Solano passively resisted him by cursing, saying "something about the

3   water,""backing up towards the exit door," and asking to leave the detention center.[108]  However,

4   Temple also testified that "[m]aybe there is a language barrier or something because he is of Spanish

5   or Mexican whatever descent."[109]  But it is also undisputed that Solano was in the psychiatric unit

6   and "acting strange."[110]  Whether a reasonable officer would view Solano's initial conduct as

7   "passive resistence" or the product of a language barrier or mental illness is a question the jury must

8   resolve.

9        The material facts are even less clear after the officers took Solano to the ground.  The

10   officers testified that each "officer took precautions not to place any body weight on [Solano's] back

11   or neck,"[111] that Solano "resisted throughout the entire struggle,"[112] that "even after [Solano] was

12   handcuffed he continued to resist and yell 'get the fuck off me' to the officers,"[113] and that "Aspiazu

13   continuously monitored [Solano's] words, actions, movement[,] and breathing."[114]  But handheld-

14   camera footage offers a very different picture.  At least two (and as many as four) officers appear to

15   have their body weight on Solano's back as he lay lifelessly on the floor.[115]  And, contrary to

16   Aspiazu's testimony that he continuously monitored Solano's words, movement, and breathing, off-

---

18   [106] ECF 91 at 23; ECF 99 at 22.

19   [107] ECF 99-5 at 12.

20   [108] ECF 99-4 at 17.

21   [109] ECF 99-5 at 13.

23   [110] *See, e.g.*, ECF 91 at 7.

24   [111] ECF 91 at 9.

25   [112] *Id.* at 10.

26   [113] *Id.*

27   [114] *Id.*

28   [115] *See* ECF 84-1.

1    camera officers—who are presumably not Aspiazu—excitedly announce that Solano is "out" and

2    "may be playing possum."[116]   These facts discredit Aspiazu's testimony and tend to support

3    plaintiffs' argument that Solano was not resisting but merely struggling to breathe.   Plus, it is unclear

4    when Solano stopped resisting the officers (assuming he was actually resisting them), when the

5    officers placed their body weight on him, and how much time elapsed between these events and the

6    officers' decision to remove their weight from Solano's body.

7          Given these myriad discrepancies, a reasonable jury could find that what the officers were

8    perceiving as Solano's resistence was merely the detainee struggling for air, that multiple officers

9    placed their weight on Solano's back while he struggled for air, and that the officers remained on

10   Solano's back for minutes after he had been handcuffed and had stopped breathing.   But that same

11   reasonable jury could alternatively find that only one officer placed his weight on Solano's back

12   during the handcuffing, that Solano continued to resist while he asphyxiated, and that the officers

13   immediately removed their weight from Solano's body when it became fairly apparent he had lost

14   consciousness.

15         With these material facts in genuine dispute, I cannot say what the officers actually did, and

16   this prevents me from determining as a matter of law whether the officers' use of force was

17   objectively reasonable.[117]   I thus deny the cross-motions for summary judgment on plaintiffs'

18   excessive-force claim because a material dispute exists about what the officers actually did.

19
20   **C.    Defendants are entitled to summary judgment on plaintiffs' deliberate-indifference-to-serious-medical-needs theory because the record does not support it.**

21         As part of their § 1983 claim, plaintiffs also theorize that the officers were deliberately

22   indifferent to Solano's psychiatric condition—anxiety.[118]   They argue that they are entitled to

23   summary judgment in their favor because the officers saw Solano acting strangely in the psychiatric

24

---

25   [116] *Id.*

26   [117] *Kingsley*, 135 S.Ct. at 2473.

27
28   [118] ECF 54 at ¶¶ 54(d), 60, 67.   The deliberate-indifference theory is spread across plaintiffs' first and second causes of action.

1  unit and failed to "make any inquiry into [his] medical history, prescribed medications, or anything

2  else."[119]  Defendants countermove for summary judgment in their favor, arguing that the record is

3  devoid of evidence that (1) Solano's medical need was serious and that (2) the officers were

4  subjectively aware of it and failed to respond.[120]

5
6      **1.**    ***A pretrial detainee must show a serious medical need that the corrections officers were aware of and deliberately disregarded.***

7      Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth

8  Amendment's protection against cruel and unusual punishment, governs pretrial detainees'

9  deliberate-indifference claims,[121] the standard is essentially the same.[122]  The failure to provide

10  medical treatment to a pretrial detainee violates the Constitution when (1) he has a "serious medical

11  need" and (2) detention officials are "deliberately indifferent" to it.[123]  A medical need is serious

12  when, viewed objectively, the failure to treat it "could result in further significant injury or the

13  unnecessary and wanton infliction of pain.[124]  A detention official is deliberately indifferent when he

14  subjectively knows of and disregards "an excessive risk to" the detainee's health or safety, the

15  official is "aware of facts from which the inference could be drawn that a substantial risk of serious

16  harm exists, and he  . . . [draws that] inference."[125]

17
18
---

19  [119] ECF 83 at 13.

20  [120] ECF 91 at 20.  Defendants also contend that the officers are entitled to qualified immunity from
21  this claim.  *Id*. at 21.  Because I find no genuine issue of material fact to support this claim and I
   grant summary judgment in defendants' favor for that reason, I do not reach the qualified-immunity
22  argument on this claim.

23  [121] *Castro v. Cty. of Los Angeles*, 797 F.3d 654, 664 (9th Cir.) *reh'g en banc granted*, 809 F.3d 536
24  (9th Cir. 2015); *Bell v. Wolfish*, 441 U.S. 520, 537 n. 16 (1979).

25  [122] *Id*.; *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1243–44 (9th Cir. 2010).

26  [123] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

27  [124] *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citations omitted).

28  [125]  *Farmer*, 511 U.S. at 837; *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010).

1

2

### 2. The record is devoid of evidence that the officers knew Solano had a serious medical condition and deliberately disregarded it.

3   Plaintiffs' deliberate-indifference claim suffers from two fatal flaws. First, they offer no

4   evidence (or even an argument) that Solano's anxiety was a "serious" medical condition,[126] and

5   several courts have concluded that anxiety is not sufficiently serious.[127] Second, the gravamen of

6   plaintiffs' theory is that the officers knew that Solano was "acting erratically," but they "did not

7   bother to make any inquiry regarding [his] medical history, prescribed medicals, or anything else. . .

8   ."[128] But this characterization of the officers' action as a failure to take steps that might lead them to

9   learn about his condition only disproves what plaintiffs must establish: that the officers actually

10  knew about Solano's condition and drew the inference that a substantial risk of harm existed.[129]

11   Corrections officers are liable for deliberate indifference only when they "know[] of and

12  disregard[] an excessive risk to inmate health or safety."[130] Plaintiffs point to no evidence, let alone

13  undisputed evidence, that these officers had this requisite state of mind.[131] Indeed, they appear to

14  have conceded as much; their responsive briefs do not even attempt to rebut the defendants'

15  arguments that bring light to this fatal deficiency.[132] I therefore conclude that there is no genuine

16

17  [126] See ECF 83 at 13.

18
19  [127] See, e.g., Shenk v. Cattaraugus Cty., 305 F. App'x 751, 754 (2d Cir. 2009) ("We have never held
    that mental anxiety is a serious medical need . . ."); Long v. Nix, 877 F. Supp. 1358, 1366 (S.D. Iowa
20  1995) aff'd, 86 F.3d 761 (8th Cir. 1996) ("The Court finds that this anxiety is not a serious medical
    need.").

21  [128] ECF 83 at 13.

22
23  [129] Simmons v. Navajo Cty., Ariz., 609 F.3d 1011, 1017–18 (9th Cir. 2010) (citation omitted).

24  [130] Farmer, 511 U.S. at 837 (emphasis added).

25  [131] Indeed, the prison's medical-records policy and HIPPA regulations would likely have prevented
    the officers from drawing the necessary inferences because they prohibit the officers from making
26  inquiries into Solano's medical history. See, e.g., ECF 91-4 at 11.

27  [132] See generally ECF 102 (abandoning plaintiffs' deliberate-indifference claim); ECF 106 (same).
    Of course, summary judgment may not be granted by default. See Heinemann v. Satterberg, 731
28  F.3d 914, 917 (9th Cir. 2013). My decision to grant summary judgment on this claim is based on a

1   issue of material fact to support plaintiffs' deliberate-indifference claim.  I grant summary judgment

2   in favor of the defendants and against the plaintiffs on this claim.

3   **D.    The record does not support plaintiffs' substantive due-process claim.**

4       The third and final theory that underlies plaintiffs' § 1983 claim is that the officers' use of

5   force violated Solano's children's substantive due-process right to their father's companionship.[133]

6   Children may bring a Fourteenth Amendment substantive-due-process claim if they are deprived of

7   their liberty interest in the companionship and society of their parent through official conduct.[134]

8   Mere negligence or tortious conduct is not constitutionally actionable; the official conduct must

9   "shock the conscience."[135]

10      The first question when deciding whether this standard has been met is whether actual

11  deliberation by the officer was practical.[136]  "Where actual deliberation [was] practical, then an

12  officer's 'deliberate indifference' may suffice to shock the conscience."[137]  If it was not practical, and

13  an officer "makes a snap judgment because of an escalating situation, his conduct may only be found

14  to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement

15  objectives."[138]  "For example, a purpose to harm might be found where an officer uses force to bully

16  a suspect or 'get even.'"[139]

17      There is no genuine dispute that Solano's restraint resulted from the officers' snap judgment

18

19  careful examination of the record.

20  [133] ECF 54 at 11.

21  [134] *Lemire v. Cal. Dept. of Corrections & Rehabilitation,* 726 F.3d 1062, 1075 (9th Cir. 2013); *see*
22  *also Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citations omitted).

23  [135] *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("The Supreme Court has made it clear . . .
24  that only official conduct that 'shocks the conscience' is cognizable as a due process violation.").

25  [136] *Id.* (citation omitted).

26  [137] *Id.* (citation omitted).

27  [138]  *Id.* (citation omitted).

28  [139]  *Id.* (citation omitted).

about the best way to handle an escalating situation.  Thus, the salient inquiry is whether there is any evidence that the officers acted with a purpose to harm Solano that was unrelated to legitimate law-enforcement objectives.  Plaintiffs represent that "a genuine issue of material fact exists as to whether the Officers' actions *after* Solano was handcuffed were an attempt to 'get even' with Solano for allegedly resisting the Officers."[140]  But they point to no evidence to support this suggested motive, and my own review of the record reveals none.  Because plaintiffs have offered no evidence to suggest that the officers acted to purposely harm Solano, plaintiffs cannot prove their substantive-due-process claim, and I grant summary judgment on this claim in the defendants' favor.

**E.    Defendants are entitled to summary judgment on plaintiffs' *Monell* claim.**

A municipal entity like Metro cannot be held liable under § 1983 solely because it employs a tortfeasor.[141]  So, in their third cause of action, plaintiffs seek to hold Metro liable for Solano's death under *Monell v. Department of Social Services*, which extends § 1983 liability to Metro only if the constitutional violation was the result of a Metro policy, practice, or custom or a decision-making official directed or ratified it.[142]

Plaintiffs allege that the officers acted according to Metro's policy, practice, and custom to "ratify the use of unreasonable and excessive force," and to "inadequately hire, train[,] and supervise its officers . . . in positional asphyxia and excessive force in general."[143]  In response to defendants' argument that there is no evidence of these alleged policies, practices, and procedures,[144] plaintiffs offer the testimony of Clark County Medical Examiner Dr. Telgenhoff, whom they contend testified that "he comes across two to three deaths each year that resulted from positional asphyxiation during

---

[140] ECF 106 at 24; ECF 108 at 12.

[141] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 984 (9th Cir. 2002).

[142] *Ulrich v. City & Cty. of City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001).

[143] ECF 54 at 13.

[144] ECF 99 at 34.

1   police restraint procedures."[145]  "These types of deaths have concerned Dr. Telgenhoff to the point of

2   discussing his concerns with LVMPD supervisors in the past," Solano-Patricio represents.[146]

3   Plaintiffs also argue that summary judgment on this claim would be premature until they have the

4   opportunity to conduct additional discovery into this "widespread 'custom' of LVMPD officers

5   improperly restraining individuals, in some cases, to the point of death."[147]

6          Plaintiffs materially over-represent Dr. Telgenhoff's testimony.  He did not testify that he

7   comes across two or three positional-asphyxiation deaths caused *by Metro* each year; he said that he

8   could take a "wild guess" and "speculat[e]"—because he has not "sat down and tallied them

9   up"—that he comes by two or three positional-asphyxiation deaths caused by *police* each year.[148]  He

10  also did not testify that these deaths were caused while individuals were in the custody of Metro as

11  opposed to another local police organization or that they occurred at the CCDC.[149]  And when asked

12  whom at Metro he talked to, he explained that the coroner's office "automatically" investigates "all

13  deaths while in custody," so these discussions occurred with "[w]hoever was chief of homicide at

14  that particular time" he called in the results of the autopsy.[150]  Dr. Telgenhoff's "wild guess" about

15

16  [145]ECF 106 at 25.

17  [146] *Id.*

18  [147] ECF 106-1 ¶ 14; ECF 106 at 25 (citing FED. R. CIV. P. 56(d)).

19  [148] *See* ECF 111 at 5.

20  [149] ECF 106 at 3–4 ("Q: And how many—I know it would be impossible to hazard a guess as to how

21  many total autopsies you've done and determinations of cause of death you've done in regards to
    individuals who expire while in custody.  So let's set that aside . . . . How many times do you believe

22  you have been involved and/or opined prior to this particular autopsy report that there had been a
    death as a result of positional asphyxia?  A: Under police restraint procedures?  Q: Yes, thank you.

23  A: Yes, many.  But it would be a wild guess.  Q: I understand.  A: It would be speculation on my

24  part.  I haven't sat down and tallied them up, but I wouldn't be surprised if it was probably two to
    three times a year. . . . Q: So if you're seeing two to three times a year a death due to positional

25  asphyxia due to police restraint procedures, would it be safe to assume that the other four or five

26  forensic pathologists [at the Clark County Coroner's Office] are seeing an equivalent estimate
    number? . . . A: I think it's reasonable to do that, but I'm not sure how accurate that would be.  I

27  don't know if there's any philosophical ways to approach it.  But it would just be a guess. . . ").

28  [150] ECF 106-2 at 33–35.

1   how many police-custody positional-asphyxiation deaths he sees annually on a county-wide basis is

2   not competent proof a widespread Metro policy, practice, or custom to "ratify the use of

3   unreasonable and excessive force" or "inadequately hire, train[,] and supervise its officers . . . in

4   positional asphyxia and excessive force in general."[151]

5         Nor does this "wild guess" justify delaying summary judgment on this claim and reopening

6   discovery to let the plaintiffs go on a fishing expedition for such a policy, practice, or custom.  The

7   Ninth Circuit has consistently recognized that a Rule 56(d) request may be denied when the evidence

8   sought is the object of pure speculation.[152]  And a party seeking a Rule 56(d) delay must show that it

9   "diligently pursued its previous discovery opportunities."[153]  Plaintiffs have not explained why they

10  did not pursue this avenue of discovery in the last two-and-a-half years of this litigation or why Dr.

11  Telgenhoff was not deposed earlier than 11 days before the last-extended discovery deadline.

12  Plaintiffs have not identified a genuine issue of fact to preclude summary judgment on this claim or

13  carried their Rule 56(d) burden to delay it.  Accordingly, I grant summary judgment on plaintiffs'

14  *Monell* claim in favor of Metro.

15  **F.     Discretionary-function immunity under NRS § 41.032**

16        Plaintiffs' fourth, fifth, sixth, seventh, and eighth causes of action are Nevada state-law

17  claims for assault, battery, negligence, negligent supervision and training, and wrongful death.[154]  All

18  but the negligent-supervision-and-training claim—which is pled against Metro only—are alleged

19  collectively against the corrections officers, Sheriff Gillespie, and Metro.[155]  The parties agree that

20  each of these claims is initially governed by the Fourth Amendment's reasonableness standard and

21

22  _____

23  [151] ECF 54 at 13.

24  [152] *State of Cal. v. Campbell*, 138 F.3d 772, 779-80 (9th Cir. 1998) (decided under former Rule
    56(f)); *Martinez v. Columbia Sportswear USA Corp.*, 553 F. App'x 760, 761 (9th Cir. 2014)
25  (collecting authority).

26  [153] *Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir. 1994).

27  [154] ECF 54 at 15–18.

28  [155] *Id.*

1   would fail if I had found that the officers' use of force was reasonable.[156]   The parties disagree on the

2   next step of my analysis: the applicability of Nevada Revised Statute §41.032(2), which grants Metro

3   and its employees discretionary immunity from state-law claims based on "the failure to exercise or

4   perform a discretionary function . . . whether or not the discretion involved is abused."[157]

5

6   **1.   *Plaintiffs' negligent-supervision-and-training claim against Metro is barred by NRS 41.032(2).***

7           I begin my NRS 41.032(2) discussion with plaintiffs' seventh claim for relief, which seeks to

8   hold Metro responsible for Solano's death due to negligent supervision and training.[158]   Decisions on

9   hiring, training, and supervising employees "usually involve policy judgments of the type" protected

10  by the discretionary-function exception.[159]   Plaintiffs offer no reason their negligent-supervision-and-

11  training claim against Metro is unique or exempt from this general rule.   I conclude that the alleged

12  actions on which this claim is based—failure "to properly and adequately train and supervise officers

13  and personnel under their control so as to avoid unreasonable risk of harm to citizens" and "having

14  inadequate training and supervisory procedures regarding the excessive use of force and securing of

15  medical treatment for injured/ill inmates"[160]—are discretionary acts under Nevada law.   Metro is thus

16  entitled to summary judgment on plaintiffs' seventh cause of action based on NRS 41.032(2).

17

18  _____

19  [156] *Compare* ECF 99 at 36 (citing *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996)) *with* ECF 106 at 26 (also citing *Ramirez*).

20  [157] Nev. Rev. Stat. § 41.032 ("no action may be brought . . . against . . . an officer or employee of the
21  State or any of its agencies or political subdivisions which is: . . .  2. Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the
22  State or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused..").

23
24  [158] ECF 54 at 17.

25  [159] *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (referencing discretionary-act immunity from Federal Tort Claims Act claims); *see also Butler ex rel. Biller v. Bayer*, 168 P.3d
26  1055, 1066 n. 50 (Nev. 2007) (recognizing that Nevada's "discretionary-act immunity provision contained in NRS 41.032(2) is 'virtually identical' to the discretionary-act immunity provision found
27  in the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (2000).").

28  [160] *Id.*

1

2

         **2.**      ***Genuine issues of fact preclude summary judgment on the remaining state-law***
             ***claims against Metro and the corrections officers.***

3

      The same cannot be said for plaintiffs' remaining state-law claims against the corrections

4

officers and Metro.  "Police officers 'exercise discretion and are thus generally immune from suit

5

where the act at issue required personal deliberation, decision, and judgment, rather than obedience

6

to orders, or the performance of a duty in which the officer is left no choice of his own.'"[161]  The

7

plain language of Nevada's discretionary-immunity statute protects officers from "the failure to

8

exercise or perform a discretionary function . . . *whether or not the discretion involved is abused*."[162]

9

As Ninth Circuit Judge Reinhardt explained in *Davis v. City of Las Vegas*, "An officer's decision as

10

to how to accomplish a particular seizure or search is generally considered a discretionary

11

determination under Nevada law, and officers are therefore immune from suit as to state law claims

12

arising therefrom in most cases."[163]

13

      But this immunity has limits.  Officers lose their immunity from state-law claims when they

14

act in bad faith.[164]  "Where an officer arrests a citizen in an abusive manner not as the result of the

15

exercise of poor judgment as to the force required to make an arrest, but instead because of hostility

16

toward a suspect or a particular class of suspects . . . or because of a willful or deliberate disregard

17

for the rights of a particular citizen or citizens, the officer's actions are the result of bad faith and he

18

is not immune from suit."[165]

19

      The *Davis* court found an officer was not entitled to summary judgment based on NRS

20

21

22

[161] *Sandoval v. Las Vegas Metropolitan Police Dept.*, 756 F.3d 1154, 1168 (9th Cir. 2014) (quoting *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007)).

23

[162] Nev. Rev. Stat. § 41.032 (emphasis added).

24

[163] *Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir. 2007).

25

26

27

[164] *Falline v. GNLV Corp.*, 823 P.2d 888, 891–92 (Nev. 1991); *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 139 (Nev. 2014) (en banc) (quoting *Falline*, 823 P.2d at 891–92) ("[Section 41.032] does not protect a government employee for intentional torts or bad-faith misconduct, as such misconduct, 'by definition, [cannot] be within the actor's discretion.'").

28

[165] *Davis*, 478 F.3d at 1060.

41.032(2) immunity from claims that the officer slammed an arrestee's head into a wall multiple times and punched the arrestee in the face while he lay prone on the ground.[166]  The panel reasoned, "[a]ssessing the facts . . . in the light most favorable to [the arrestee], a reasonable juror could find that" the officer's actions were "not merely an exercise or abuse of discretion but instead constituted a deliberate and wilful disregard for the law, or malicious conduct motivated by" the officer's "animosity toward" the arrestee for his refusal to consent to a search.[167]

Although this record is devoid of evidence that defendants purposely harmed Solano, whether they deliberately or willfully disregarded the law as explained in *Drummond* cannot be determined on summary judgment.  Each of these Metro officers was trained "to avoid placing body weight on the back or torso of a prone handcuffed individual for an extended period of time,"[168] and Aspiazu testified that he was the only officer of the four who restrained Solano by placing his body weight on him.[169]  But the video footage of the event refutes Aspiazu's recount; it shows as many as all four of the officers kneeling on Solano at once.  Taking these facts in the light most favorable to the plaintiffs, a reasonable jury could conclude that the officers' actions were "not merely an exercise or abuse of discretion but instead constituted a deliberate and wilful disregard for the law."[170]

Thus, just as "contested issues of material fact with respect to" the officer's "conduct and his motivation" in *Davis* precluded the district judge from granting summary judgment based on

---

[166] *Id.*

[167] *Id.*

[168] ECF 99 at 17; ECF 99-4 at 65:1–5; ECF 99-5 at 6–8; ECF 99-6 at 7–10; ECF 99-7 at 23; ECF 99-13.

[169] ECF 99-4 at 22 (deposition at 74:20–23; 75:15–19).

[170] *Davis*, 478 F.3d at 1060.  I appreciate that I walk a fine line in finding that these facts preclude summary judgment on plaintiffs' state law claims but do not save plaintiffs' substantive-due process claim from summary judgment.  The due-process claim is governed by the higher shocks-the-conscience standard, which requires plaintiffs to show that the correctional officers acted with a purpose to harm Solano that was unrelated to legitimate law-enforcement objectives.  Based on this factual record, a reasonable jury could conclude that the corrections officers acted in wilful disregard of the law but lacked the intent to purposely harm Solano.

discretionary immunity,[171] the materially divergent accounts of Temple, Gray, Dixon, and Aspiazu's actions prevent me from granting summary judgment in favor of the corrections officers or Metro on plaintiffs' claims for assault, battery, negligence, or wrongful death on the basis of state statutory immunity.

**G.      Sheriff Gillespie is entitled to summary judgment on all claims against him.**

To the extent that plaintiffs have intended to state any claim against Sheriff Gillespie, they don't even mention him in their oppositions, let alone offer evidence to support a claim against him on any theory.[172]  I find that the defendants have shifted the burden to the plaintiffs to come forward with evidence to support their claims against Sheriff Gillespie and that plaintiffs did not rise to that challenge.  They didn't even try to.  Accordingly, Sheriff Gillespie is entitled to summary judgment on all claims against him.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

- Plaintiff Solano-Patricio's motion for partial summary judgment **[ECF 83] is DENIED**;

- Defendants' motion for summary judgment **[ECF 99] is GRANTED in part and DENIED in part** as explained in this order, **leaving only**: (1) the portion of plaintiffs' first cause of action alleging a § 1983 **excessive-force claim against defendants Temple, Gray, Dixon, and Aspiazu**, (2) the portion of plaintiffs' second cause of action alleging a § 1983 **deliberate-indifference**-to-serious-medical-needs claim **against Naphcare**, and (3) plaintiffs' fourth, fifth, sixth, and eighth causes of action (**assault, battery, negligence, and wrongful death**) **against Temple, Gray, Dixon, Aspiazu, and Metro.**

---

[171] *Id.*

[172] *See* ECF 111 at 19.  Plaintiff's liability theory against the Sheriff is that he "was, or should have been, aware of" the corrections officers' "unlawful acts, policies, and practices."  ECF 54 at ¶ 51.  But they offer no evidence to support this theory in their oppositions, and they do not even mention him in their state-claims discussion.  *See* ECF 106 at 26–28; ECF 108 (offering no state-law-claim analysis at all).

1        •    **This order terminates all claims against Sheriff Gillespie**; and

2        •    Plaintiff Solano-Patricio's Request for Hearing/Oral Argument **[ECF 115] is**

3           **DENIED**.

4       IT IS FURTHER ORDERED that **this matter is referred to the magistrate judge for a**

5 **settlement conference** in which all parties are directed to participate in good faith.  The deadline for

6 filing the joint pretrial order is HEREBY STAYED until 15 days after the settlement conference is

7 completed.

8       Dated this 19th day of February, 2016.

9

10                         _____

11                         Jennifer A. Dorsey
                           United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28